Opinión disidente emitida por la
Juez Asociada Señora Rodríguez Rodríguez, a la cual se une la Jueza Asociada Señora Fiol Matta.
El caso de epígrafe nos brindó la oportunidad de resolver que los dueños o directores de un establecimiento o *822 empresa responden civilmente por los daños y perjuicios ocasionados por uno de sus empleados al hostigar sexualmente a un tercero, a tenor con lo dispuesto en el Art. 1802 del Código Civil de Puerto Rico. De esta forma se reforzaba la clara política pública que priva en nuestra sociedad de rechazo al acoso sexual en el trabajo.
I
El caso de epígrafe se inició en julio de 2001 mediante la presentación de una demanda por hostigamiento sexual bajo la Ley Núm. 17 de 22 de abril de 1988 (29 L.P.R.A. see. 155 et seq.) y bajo los Arts. 1802 y 1803 del Código Civil de Puerto Rico, 31 L.P.R.A. sees. 5141 y 5142. La demanda se instó contra Televicentro de Puerto Rico (Televicentro) y el Sr. Moisés Vélez, empleado de esta compañía. Se alegó que el señor Vélez llevó a cabo actos de naturaleza sexual no deseados contra la demandante, Sra. Mariela Hernández Vélez.(1) Contra Televicentro se alegó que había sido negligente al no prevenir, desalentar o evitar que su empleado incurriera en actos de carácter sexual en el empleo, en particular a la luz del historial previo de conducta de Vélez. Finalmente, se indicó que ambos respondían solidariamente.
La demandante, por su parte, laboraba en calidad de contratista independiente para la compañía J & K Enterprises, Inc. (J & K Enterprises), la cual se dedica a la producción de programas para Televicentro de Puerto Rico, específicamente del programa Super Exclusivo. Para el periodo de los hechos alegados en la demanda este programa transmitía todos los viernes un segmento titulado: “¿Qué es de la vida de ...?” En éste se entrevistaba a un actor *823 reconocido del pasado, sobre el cual poco se sabía en la actualidad.
J & K Enterprises, a su vez, era un contratista independiente de Televicentro. Esta compañía contrata sus propios empleados, pero Televicentro le provee sus camarógrafos para grabar sus entrevistas, además de que le facilita una oficina en sus predios para su operación.
Instada la demanda, Televicentro la contestó. En su contestación, Televicentro negó su responsabilidad e, incluso, rechazó que el señor Vélez estuviese involucrado en un incidente previo de índole sexual. Alegó que actuó como un buen padre de familia al llevar a cabo una investigación adecuada sobre lo acontecido y tomar como medida correctiva que el señor Vélez no fuese asignado a las grabaciones con la peticionaria. Televicentro indicó que tenía una política sobre hostigamiento sexual, contenida en un memorando de 14 de junio de 1999, que había circulado a todos sus empleados.(2)
*824 Además, arguyo que no respondía vicariamente, ya que las actuaciones alegadas no se realizaron con el propósito de servir y proteger los intereses de la compañía ni se encontraban entre las funciones del camarógrafo Moisés Vélez.
Celebrada la vista en su fondo quedó demostrado lo siguiente:
El 27 de abril de 2001 la señora Hernández recibió la encomienda de entrevistar al Sr. Oscar Solo en la residencia de éste en Bayamón. Para que la asistiera, Televicentro asignó a su empleado, el camarógrafo Moisés Vélez. Vélez habría de grabar la entrevista. Televicentro también le proveyó a la señora Hernández uno de sus vehículos para trasladarse a Bayamón junto al señor Vélez.
Mientras ambos se dirigían en el vehículo a la residencia del señor Solo, el señor Vélez le explicó a la señora Hernández que no podía saludarla cuando estaban en el canal porque los muchachos se burlaban de él, a lo que la peticionaria le contestó que él podía saludarla si quería. Asimismo, el señor Vélez le indicó a la demandante que tenía la piel muy blanca, por lo que necesitaba tomar sol.
Al llegar al lugar donde se realizaría la entrevista y mientras subían en el elevador, la peticionaria sintió que el señor Vélez le rozó sus glúteos con la cámara de batería que portaba, propiedad de Televicentro. Como había espacio suficiente en el ascensor para las tres personas que se encontraban en éste, la señora Hernández se alejó un poco de Vélez. Una vez llegaron al apartamento del entrevistado y prestos a entrar, Hernández sintió nuevamente un roce con la cámara, esta vez en la espalda. En esta ocasión, *825 la señora Hernández le manifestó tajantemente al camarógrafo que cesara su conducta.
Finalizada la grabación y de regreso a Televicentro, Vélez comenzó a conducir por una ruta distinta a la conocida por la peticionaria. Debido a ello y a que se sentía mareada, la señora Hernández pidió que regresaran inmediatamente al canal de televisión. El señor Vélez le indicó que estaba muy pálida y, acto seguido, comenzó a hacer sonidos jadeantes con la boca, simulando como si estuviera succionando algo. Cuando la peticionaria lo miró, éste se lamía los labios. Entonces, la señora Hernández le preguntó qué le pasaba, a lo que él respondió que ella le gustaba. En ese momento, la peticionaria reiteró su deseo de regresar a Televicentro. No obstante, el camarógrafo continuó haciendo ruidos y le dijo a la peticionaria que “hacía tiempo que no tenía buen sexo”. Véase Apéndice, págs. 28-29.
Ante lo ocurrido, la señora Hernández comenzó a insultar a su acompañante, tomó su abrigo y se acercó a la ventana de la puerta. El señor Vélez le manifestó que debía calmarse, mas que no se preocupara puesto que el vehículo tenía tintes y no se veía para adentro. Posteriormente, cuando miró al señor Vélez, se percató que éste mostraba el órgano sexual masculino fuera del pantalón. Entonces la señora Hernández insistió en regresar a Televicentro. Al llegar a la estación de televisión, el señor Vélez le expresó a Hernández: “que esto quede entre nosotros.” Véase Apéndice, pág. 29.
Enterado de dicho incidente, el jefe directo de la peticionaria, el Sr. Antulio Santarrosa, le informó lo acontecido al Sr. José E. Ramos, Presidente de Televicentro, y este último, a su vez, se comunicó con la Sra. Norma Cruzado, Directora de Recursos Humanos de Televicentro.
La señora Cruzado procedió entonces a entrevistar a la peticionaria.(3) La señora Hernández solicitó no trabajar *826 más con el señor Vélez. A raíz de lo anterior, Cruzado se comunicó por vía telefónica con el supervisor del señor Vélez y le dio instrucciones a los efectos de que la peticionaria no podía trabajar junto a éste. Por otro lado, ese mismo día en la tarde, la señora Cruzado entrevistó al Sr. Moisés Vélez. A preguntas de Cruzado sobre lo ocurrido con la peticionaria, Vélez bajó la cabeza, se encontraba nervioso, y dijo: “cometí un error y lo siento.”
Una vez conocidas ambas versiones, la señora Cruzado recomendó al señor Ramos que se suspendiera tanto al señor Vélez como a la señora Hernández, ello a pesar de que ésta no era empleada de Televicentro. El señor Ramos sin embargo, impartió instrucciones de enviar a Vélez una carta con una advertencia de que sería despedido si ocurriese otro incidente parecido. El 7 de mayo de 2001 se le entregó a Vélez la misiva en la que se indicó lo siguiente:
En dicha reunión, usted [Sr. Moisés Vélez] aceptó su error en el incidente de carácter sexual que ocurriera entre usted y [la peticionaria] Mara Hernández, empleada del programa Super Exclusivo. En la misma, se hizo referencia a otro caso en el cuál usted también estuvo involucrado, pero esa vez, con una empleada de Televicentro. Además, se le enfatizó que de usted incurrir en otra [sic] incidente de esta índole, la Compañía se verá en la obligación de tener que cesantearlo permanentemente de su empleo.
Le recordamos que es política de la compañía mantener un ambiente libre de todas las formas de intimidación y hostigamiento; por lo tanto, no se tolerará conducta inapropiada de parte de ninguno de sus empleados, ni de personas relacionadas a Televicentro. Apéndice, pág. 36.
Es de notar que en la carta se reconoció que con anterioridad había ocurrido un incidente similar entre el señor Vélez y una empleada de Televicentro.(4) En aquella oca *827 sión, aproximadamente siete meses antes del que dio lugar a la demanda de epígrafe, Vélez había intentado besar en la boca a una maquinista de la estación. Fue el propio Vélez quien, temeroso de ser acusado de hostigamiento sexual por la empleada, acudió ante la señora Cruzado a reportar lo sucedido indicando que “había entrado a maquillaje a dar un beso como de costumbre” y que “había tropezado” y la maquinista “pensó que él le iba a dar un beso en la boca”. Sentencia del Tribunal de Primera Instancia, determinación de hecho Núm. 46, Apéndice, pág. 32. Según se desprende de la sentencia de instancia, Televicentro le requirió verbalmente al camarógrafo que evitara “el contacto y los besos con las empleadas”, con lo que el señor Vélez estuvo de acuerdo. íd.
Subsiguientemente, Televicentro le impuso a la demandante la restricción de no proveerle transportación para las entrevistas que hacía fuera del canal, por lo que la señora Hernández tenía que proveerse su propia transportación.
A la luz de los hechos probados, el Tribunal de Primera Instancia, en una extensa y ponderada sentencia, resolvió que el señor Vélez, en efecto, había realizado avances sexuales no deseados hacia la señora Hernández. Indicó que ello creó un ambiente hostil, intimidante y humillante, por lo que declaró “con lugar” la demanda en su contra y le condenó a pagar una cantidad ascendente a $50,000, más las costas del litigio. El foro primario concluyó también que antes de ocurrir los hechos de este caso, el señor Vélez “ya había tenido un incidente de carácter sexual con una maquinista”. Apéndice, pág. 50.
Con relación a Televicentro, el tribunal de instancia concluyó que éste era solidariamente responsable junto al señor Vélez, conforme a su propia negligencia bajo el Art. 1802 del Código Civil de Puerto Rico, supra. El foro primario concluyó que Televicentro fue negligente por su “falta de cuidado, en no anticipar las consecuencias probables de *828 un acto o una omisión, o sea la falta de previsibilidad”.(5) El tribunal resolvió que el deber de previsibilidad del patrono no se limitaba a corregir situaciones pasadas de hostigamiento sexual, sino a prevenir que ocurrieran en el futuro. En este caso, Televicentro, aun cuando tenía establecido una política de no tolerancia al hostigamiento sexual en el empleo al igual que sanciones establecidas por violar dicha norma, no le impuso ninguna sanción al señor Vélez por el primer incidente, más allá de una mera advertencia verbal, y en el caso de autos, sólo le envió una carta de amonestación. El foro sentenciador entendió que Televicentro no empleó la diligencia de un buen padre de familia para prevenir el daño ocasionado a la señora Hernández.
El foro primario también concluyó que Televicentro respondía bajo el Art. 1803 del Código Civil de Puerto Rico, supra, ya que el señor Vélez se encontraba en funciones de su trabajo y durante sus horas laborables cuando incurrió en la conducta censurable. Indicó el tribunal que, aunque la acciones de Vélez fueron contrarias a la política de Televicentro, éstas fueron incidentales al trabajo que realizaba en ese momento, el cual beneficiaba a Televicentro.
Inconforme con la determinación anterior, Televicentro recurrió al Tribunal de Apelaciones. Dicho foro modificó la sentencia apelada al confirmar la responsabilidad del camarógrafo Vélez, pero desestimar la reclamación contra Televicentro. El Tribunal de Apelaciones concluyó que Televicentro no era responsable vicariamente por los actos cometidos por su empleado, ya que los acercamientos sexuales del señor Vélez en nada se relacionaban con sus funciones de camarógrafo ni con la tarea encomendada de grabar la entrevista.(6) Al así concluir, el tribunal a quo *829 determinó que era innecesario discutir si Televicentro era responsable bajo el citado Art. 1802 del Código Civil de Puerto Rico por no haber previsto los daños ocurridos.
En desacuerdo, la demandante acudió ante nosotros y levantó como errores los siguientes:
Erró el Honorable Tribunal de Apelaciones al revocar la determinación del Tribunal de Instancia imponiendo responsabilidad a Televicentro toda vez que ésta no cumplió con su obligación de prev[e]r que los hechos negligentes realizados por su empleado el co-demandado Vélez ocurrieran ....
Cometió error de derecho el Honorable Tribunal de Apelaciones al intervenir con las determinaciones de hechos que hiciera el Honorable Tribunal de Primera Instancia al evaluar la prueba testifical presentada en juicio sin que se haya demostrado pasión o p[er]juicio.
El 20 de mayo de 2005 expedimos el recurso de certiorari presentado. Contando con el beneficio de la comparecencia de ambas partes y los autos del presente caso, y estando en posición de resolver, este Tribunal confirmó, desafortunadamente, el dictamen del foro apelativo intermedio.
II
Es norma de conducta que gobierna la convivencia humana aquella que postula el no causar daño a los demás. Quien incumple con ésta responde por el daño causado. Es decir, está sujeto a responsabilidad, lo que a su vez se traduce en la obligación de indemnizar o reparar los perjuicios causados a la víctima. La doctrina reconoce —a grandes rasgos— dos grupos o categorías de actos dañosos: aquellos que surgen del incumplimiento de lo pactado y “los que se producen en el desarrollo de cualesquiera actividades humanas, pero al margen de toda relación jurídica previa en *830 tre dañador y víctima”. R. De Ángel Yágüez, La Responsabilidad Civil, Bilbao, Universidad de Deusto, 1988, pág. 24. En esta ocasión nos concierne precisamente esta última, la cual aparece regulada, entre otros, en los Arts. 1802 y 1803 del Código Civil de Puerto Rico, supra. Nos toca resolver, entonces, si a la luz de los hechos transcritos anteriormente se configura una causa de acción contra Televicentro de Puerto Rico, ya bien bajo el Art. 1802 o el Art. 1803 del Código Civil de Puerto Rico, supra.
Como en tantas otras ocasiones hemos indicado, para que prospere una reclamación al amparo del Art. 1802 del Código Civil de Puerto Rico, supra, se requiere que se lleve a cabo una actuación u omisión culposa o negligente; que se ocasione un daño y que exista una relación causal entre la acción y omisión y el daño ocasionado. Valle v. E.L.A., 157 D.P.R. 1 (2002); Elba A.B.M. v. U.P.R., 125 D.P.R. 294, 308 (1990); Hernández v. Fournier, 80 D.P.R. 93, 96 (1957).
En casos en que se alegue que el daño infligido es el resultado de una omisión, además de los requisitos antes mencionados, para que se configure una causa de acción se requiere: primero, demostrar la existencia de un deber jurídico de actuar de parte del alegado causante del daño y el incumplimiento de éste con ese deber, y segundo, si de haberse realizado el acto omitido se hubiera evitado el daño. Soc. Gananciales v. G. Padín Co., Inc., 117 D.P.R. 94, 106 (1986). Véanse: Santiago v. Sup. Grande, 166 D.P.R. 796 (2006); Administrador v. ANR, 163 D.P.R. 48 (2004); Elba A.B.M. v. U.P.R., ante. Véanse, además: J. Castán Tobeñas, Derecho civil español, común y foral, 15ta ed., Madrid, Ed. Reus, 1993, T. 4, pág. 942 esc. 1; J. Puig Brutau, Fundamentos de Derecho Civil, Barcelona, Ed. Bosch, 1983, T. II, Vol. 3, pág. 80.
La existencia de un “deber jurídico de actuar” es presupuesto indispensable para que se configure la causa de acción por omisión. “[H]ay que entender que todos los posibles comportamientos omisivos que se hayan producido en *831 el universo mundo, no pueden entrar en juego como factores determinantes de una daño indemnizable.” L. Diez-Picazo, Derecho de Daños, Madrid, Ed. Civitas, 1999, pág. 288. De ahí que Diez-Picazo postule, con acierto, que la omisión sólo será fuente de responsabilidad “si existe un especial deber legal o negocial de obrar ...”. (Enfasis nuestro.) íd., pág. 290. En otras palabras, da lugar a la indemnización de daños cuando “exista por virtud de la ley o un negocio jurídico el deber de practicar el acto omitido”, íd., pág. 289. Véanse: Elba A.B.M. v. U.P.R., supra, pág. 308; Santiago v. Sup. Grande, supra. Por lo tanto, si existe una disposición legal que tenga por objeto la protección de otra persona, quien esté llamado a brindar tal protección tiene un deber afirmativo de actuar, y si lo incumple y como resultado de ello ocurre un daño, tendrá la obligación de repararlo.
Por otra parte, es menester señalar que en toda reclamación instada bajo el Art. 1802 del Código Civil de Puerto Rico, supra, el factor de la previsibilidad es un elemento esencial. Pons v. Engebretson, 160 D.P.R. 347 (2003); Elba A.B.M. v. U.P.R., supra, pág. 309; Baralt et al. v. ELA, 83 D.P.R. 277 (1961). El grado de previsibilidad requerido en cada caso ha de variar en función al estándar de conducta que aplique. El deber de cuidado del empresario incluye tanto la obligación de anticipar el daño, así como la de evitar que éste ocurra, cuando la probabilidad de su ocurrencia es razonablemente previsible. Pons v. Engebretson, supra. Para determinar si el resultado era razonablemente previsible es preciso acudir a la figura de la mujer o el hombre prudente y razonable, que es quien actúa con el grado de cuidado, diligencia, vigilancia y precaución exigido por las circunstancias. Monllor v. Soc. de Gananciales, 138 D.P.R. 600, 604 (1995).
Así también, para que exista responsabilidad por un daño causado por la negligencia de otro, es necesario que entre ésta y aquél exista una relación causal; para que *832 exista esta relación causal es necesario que el daño ocasionado haya sido previsible y evitable, de haberse realizado a tiempo la acción omitida. Montalvo v. Cruz, 144 D.P.R. 748, 759 (1998), y casos allí citados. “Un daño parece ser el resultado natural y probable de un acto negligente si después del suceso, y mirando retroactivamente el acto que se alega ser negligente, tal daño aparece como la consecuencia razonable y ordinaria del acto.” Toro Aponte v. E.L.A., 142 D.P.R. 464, 474 (1997).
Luego de establecido el marco doctrinal, apliquémoslo a los hechos del caso de autos.
III
Indicamos anteriormente que la existencia de un deber jurídico de actuar es presupuesto imprescindible a la hora de imponer responsabilidad en daños por la omisión de actuar. El reconocimiento de la existencia de tal deber es esencialmente un asunto de lo justo y refleja los estándares contemporáneos de conductas aceptables para la sociedad abierta, democrática y pluralista en que vivimos. El deber así reconocido, por lo tanto, constituye una expresión social de qué comportamiento es contrario a los valores que estimamos apreciables, por lo que se justifica que el quebrantamiento de esa política social genere responsabilidad civil extracontractual. “El Derecho representa no sólo lucha contra la injusticia, sino también por más justicia. De allí que bienes e intereses valiosos deben protegerse jurídicamente antes de todo daño.” (Enfasis nuestro.) M. Zavala de González, Actuaciones por daños, Buenos Aires, Ed. Hammurabi, 2004, pág. 239.
No hay duda de que nuestra sociedad, aunque lentamente, ha ido reconociendo los efectos perniciosos del hostigamiento sexual, muy en particular en el taller de empleo. Después de todo, el acoso sexual tiene un efecto perturbador no sólo emocionalmente para la persona afee *833 tada, sino también para su rendimiento y satisfacción con el trabajo. El hostigamiento sexual es, ante todo, una de las manifestaciones típicas de la violencia de género, reflejo de discrimen y de desigualdad.
Aquellos comportamientos que en el pasado eran aceptables, como por ejemplo, las bromas, las alusiones, los comentarios o las insinuaciones de carácter sexual hechas en el taller de empleo, ya no lo son. A medida que ello ha ido ocurriendo, observamos una progresiva traslación de ámbitos que se entendían propios de lo privado a la esfera pública, con la consecuente imposición de obligaciones legales de carácter imperativo dirigidas a desterrar el hostigamiento sexual del entorno de trabajo. “El hostigamiento sexual es un problema real y su impacto es devastador no sólo en aquellos aspectos relacionados directamente con la víctima misma sino también con el patrono y con la sociedad.” R. Ortega-Vélez, Hostigamiento sexual en el empleo, San Juan, Ediciones Scisco, 1998, pág. 5. Véase, además, M.C. Díaz Descalzo, “El acoso sexual en el trabajo”, en E. Ruiz Pérez (coordinadora), Mujer y Trabajo, Albacete, Ed. Bimarzo, 2003, págs. 179-203.
Nadie pone en duda que en Puerto Rico existe una clara política pública que proscribe el hostigamiento sexual en el lugar de empleo. De ahí que la Asamblea Legislativa aprobara la Ley de Hostigamiento Sexual en el Empleo, Ley Núm. 17 de 22 de abril de 1988 (29 L.P.R.A. see. 155 et seq.). Al enunciar esa política pública, se indicó que “el hostigamiento sexual en el empleo es una forma de discrimen por razón de sexo y como tal constituye una práctica ilegal e indeseable que atenta contra el principio constitucional establecido de que la dignidad del ser humano es inviolable”. 29 L.P.R.A. see. 155.
La Ley de Hostigamiento Sexual en el Empleo le impone al patrono la obligación afirmativa de velar por la prevención, prohibición y erradicación del hostigamiento sexual en el empleo, así como también le impone el deber de tomar *834 acciones inmediatas y apropiadas para corregir cualquier situación de esta índole que se le presente. Delgado Zayas v. Hosp. Int. Med. Avanzada, 137 D.P.R. 643, 652 (1994). Así, la ley impone al patrono la responsabilidad de velar por que el taller de trabajo sea seguro, erradicando toda conducta constitutiva de hostigamiento sexual.(7)
Es incuestionable, entonces, que Televicentro tiene el deber de prevenir, prohibir y erradicar el hostigamiento sexual en su entorno. De ahí que para cumplir esa obligación en ley, circulara un memorando a todos sus empleados reiterando su compromiso de mantener un ambiente libre de todas las formas de intimidación y hostigamiento, incluyendo el hostigamiento sexual En este abarcador documento se definió el hostigamiento sexual como cualquier acercamiento sexual no deseado, solicitud de favores sexuales y conductas verbales o físicas de naturaleza sexual que, a los ojos de una persona razonable, crean una atmósfera ofensiva y hostil en el trabajo. Las sanciones dispuestas en el memorando consistían en reprimenda escrita o suspensión sin paga, o ambas, en casos de primeras ofensas. Si las actuaciones eran repetidas o mayores, el empleado podría ser despedido.
Ahora bien, a pesar de la clara política de la compañía de prohibir el hostigamiento sexual, ésta omitió actuar de una forma razonable para prevenir o evitar el daño que causara su empleado a la peticionaria. No es suficiente para descargar la obligación de mantener un taller de tra *835 bajo donde no prive el hostigamiento sexual, protegiendo así al empleado y a todo el que viene en contacto con éste, la mera formulación de preceptos reglamentarios si se hace caso omiso a éstos y a las directrices que se imparten.
Cabe recordar que en este caso, luego de que el camarógrafo de Televicentro incurriera en una conducta violatoria de la política pública establecida por la propia entidad al intentar besar a una maquinista de la compañía, ésta última meramente se limitó a indicarle verbalmente que no lo hiciera más y que debía evitar todo contacto con las empleadas de la estación en un futuro.(8)
La actitud de Televicentro se revela poco eficaz para atajar una conducta que a todas luces era contraria a la política de la compañía respecto el hostigamiento sexual. Esta omitió actuar de una forma razonable para prevenir o evitar en el futuro este tipo de actuación; fue más lo que dejó de hacer que lo que hizo. Adviértase que en el memorando circulado por la estación televisiva sobre el hostigamiento sexual, se indicaba tajantemente que “cualquier forma de hostigamiento ilícito no será tolerada”. Establecía dicho memorando que la primera ofensa podía dar margen *836 a una reprimenda escrita e, inclusive, a una suspensión sin paga. Sin embargo, confrontada con una violación a sus normas, Televicentro se limitó a indicarle verbalmente al ofensor que no podía volver a incurrir en esa -conducta, sin más.
De otro lado, fue la propia estación la que asignó al camarógrafo Vélez a trabajar con la peticionaria a pesar de que se le había indicado a Vélez que debía evitar todo contacto con las empleadas de la estación. Si bien es cierto que la peticionaria no era propiamente empleada de Televicentro, no es menos cierto que el trabajo de ésta redundaba en beneficio para Televicentro y que era la práctica de la estación ofrecer sus camarógrafos a J & K Enterprises para grabar los segmentos de este programa. Este curso de acción se nos presenta poco previsor desde la perspectiva de la persona prudente y razonable que actúa con el cuidado, la diligencia y la precaución requerida para evitar actuaciones como las que ocurrieron entre Vélez y la peticionaria.
Hemos indicado que es deber de todo patrono no tan sólo anticipar el daño, sino también evitar que éste ocurra cuando es razonablemente previsible su ocurrencia.(9) Sobre el empresario recae el deber de vigilar que las circuns *837 tandas en que se realice el trabajo no mengüen la dignidad humana y la intimidad del trabajador. El empleador tiene que velar por que en el trabajo se respeten estos derechos, los que son, en última instancia, principios esenciales de sana convivencia y respeto mutuo.
De esta suerte, todo patrono tiene la obligación o el deber de asegurar un ambiente de trabajo seguro donde no se tolere el hostigamiento sexual en cualquiera de sus manifestaciones en protección de sus empleados y de los que tienen contacto con éstos. Para ello se requiere tomar las medidas afirmativas necesarias y apropiadas para evitar y erradicar este tipo de actuación en el taller de empleo y proteger así a las personas que allí laboran. Este deber de proteger contra el hostigamiento sexual surge por virtud de ley, así como también porque ése es el estándar de conducta exigible en una sociedad como la nuestra donde la dignidad y la honra del ser humano son valores preciados.
Consideramos que en el caso de epígrafe Televicentro, advertida de la conducta del camarógrafo Vélez con una de las maquinistas de la estación, omitió tomar las diligencias exigióles para prevenir ese tipo de actuación en un futuro; como resultado de tal omisión, era previsible que acaeciesen eventos como el que dio margen a la reclamación de epígrafe. En vista de ello, Televicentro responde por sus propias omisiones, es decir, por su propia negligencia.(10) Cf., Martínez v. Chase Manhattan Bank, 108 D.P.R. 515 (1979).
Por los fundamentos antes expuestos, entiendo que procedía revocar la sentencia del Tribunal de Apelaciones donde se eximía de responsabilidad a Televicentro de Puerto Rico. Opino que Televicentro responde frente a la *838 peticionaria por sus propias omisiones negligentes en virtud del Art. 1802 del Código Civil de Puerto Rico, supra; lamentablemente una mayoría de los miembros de este Tribunal entiende lo contrario.

 El Sr. Moisés Vélez reconvino y alegó que en realidad quien le hizo acercamientos sexuales había sido la peticionaria y luego le difamó y calumnió. Adujo que la divulgación maliciosa, culposa y negligente de los hechos de este caso lo han desacreditado en su trabajo, en su comunidad y en su hogar. Véase Contestación a la Demanda Enmendada, Apéndice, págs. 78-80.

 La política sobre hostigamiento sexual de Televicentro se recogía en un memorando preparado por la gerencia del canal televisivo y circulado entre los empleados. En éste se indicaba lo siguiente:
“A pesar que todos los tipos de hostigamiento mencionados están prohibidos, el hostigamiento sexual merece atención especial. El hostigamiento por sexo es prohibido tanto con el sexo opuesto como en situaciones del mismo sexo, no importa la preferencia sexual del individuo involucrado. El hostigamiento sexual puede consistir en acercamientos sexuales no deseados, solicitud de favores sexuales y/o conductas verbales o físicas de naturaleza sexual que a los ojos de una persona razonable, crean una atmósfera ofensiva y hostil en el trabajo, que afecta el salario, beneficios o interfiera con el rendimiento [y] cumplimiento del trabajo del individuo.
“Es nuestra política que todo el personal trabaje en una atmósfera libre de discriminación y hostigamiento ilícito. En conformidad, LIN Television Corporation hace énfasis en que no permitirá a empleados (o vendedores o personas no empleados que tengan alguna razón para estar en los predios de la compañía tengan trato con nuestros empleados) enfrascarse en prácticas ilícitas y discriminatorias, incluyendo hostigamiento sexual u hostigamiento basado en raza, color, religión, origen nacional, linaje de antepasado, edad, incapacidad u alguna otra característica protegida por ley. Cualquier forma de hostigamiento ilícito está estrictamente prohibida y no será tolerada.
“LIN Television Corporation, escuchará toda querella razonable, la investigará con premura, observando confidencialidad y si es apropiado, le impondrá al empleado ofensor sanciones dirigidas al cese de la conducta ofensiva. Las sanciones impuestas por una reclamación fundamentada de hostigamiento sexual u otra forma *824 de hostigamiento impermisible, dependerá de los hechos y circunstancias del incidente. Primeras ofensas menores podrán conducir a una reprimenda escrita y/o una suspensión sin paga. Ofensas repetidas o mayores podrán resultar en despido del ofensor.
“Si usted cree que su querella de hostigamiento no ha sido tratada de una forma satisfactoria o si la acción tomada por los representantes de LIN Television Corporation, no ha logrado poner fin a la conducta de hostigamiento, por favor, llame rápidamente o acuda a una de las personas antes mencionadas, o al asesor legal de LIN Television Corporation, y exponga los detalles específicos de su queja por escrito.” Apéndice, pág. 195.

 La señora Cruzado adujo que, inicialmente, no creyó lo narrado por la señora Hernández debido a que esta última se mostró muy tranquila durante la entrevista; no obstante, recomendó posteriormente la suspensión del Sr. Moisés Vélez.

 La opinión mayoritaria cuestiona que este incidente realmente haya ocurrido, a pesar de que Televicentro de Puerto Rico, en la carta de reprimenda enviada al señor Vélez, reconociera que en efecto ocurrió un incidente anterior con una empleada de la estación televisiva.

 Véase Sentencia del Tribunal de Primera Instancia de 28 de octubre de 2003, Apéndice, pág. 49.

 A tales efectos, el Tribunal de Apelaciones expresó que los “actos delictivos cometidos por el codemandado Vélez respondían exclusivamente a motivaciones personales del codemandado, a su carácter depravado, y esa conducta sexual nada tenía que ver con sus funciones como camarógrafo, ni promovían los intereses de Televi *829 centro, por lo que tales actuaciones no podían ser atribuibles a Televicentro bajo la doctrina de responsabilidad vicaria”. Véase Sentencia del Tribunal de Apelaciones de 31 de enero de 2005, Apéndice, pág. 18.

 La Ley Núm. 17 de 22 de abril de 1988 (29 L.P.R.A. see. 155 et seq.) sólo reconoce una causa de acción cuando el hostigamiento se da entre empleados y cuando un tercero, bajo el control del patrono, hostiga a un empleado, por lo cual no cabe hablar en este caso de que se configuró una violación a esta Ley Núm. 17. Véase 29 L.P.R.A. secs. 155e y 155f.
Ahora bien, ello no significa que toda referencia a dicha ley sea innecesaria o desatinada como parece sostener la opinión del Tribunal. La referencia a dicha ley obedece a que ejemplifica diáfanamente la sabia política pública que prevalece en nuestro ordenamiento y que proscribe el acoso sexual; como tal, impone al patrono un deber de conducta más allá del estatutario. Este deber conlleva la no tolerancia de todo acto que suponga acercamientos sexuales de cualquier índole no deseados. Máxime, cuando existen normas escritas del patrono, informadas a los empleados, que proscriben el acoso sexual.

 Aquí la posición asumida por los miembros de la mayoría nos parece muy desafortunada. La opinión minusvalora el incidente anterior al destacar que la maquinista nunca se querelló de lo ocurrido. Parecería entonces sostener que la conducta reiterada de un empleado no puede ser considerada a la hora de fijar responsabilidad si no ha habido una querella formal previa en su contra, aunque el patrono sepa de la conducta como, en efecto, sucedió en este caso. No podemos avalar tal interpretación.
Por otro lado, los miembros de la mayoría obvian las siguientes determinaciones de hecho del tribunal de instancia que ya señalamos, a saber: que luego del incidente con la maquinista, Televicentro le indicó verbalmente al señor Vélez que “evitara el contacto y los besos con las empleadas”; que éste a su vez “acató” la directriz y que la propia estación hizo referencia al incidente anterior al tomar medidas disciplinarias contra Vélez luego del incidente con la señora Hernández Vélez. En cuanto a esto último, la pregunta forzada es por qué Televicentro iba a admitir la ocurrencia de un incidente que catalogó de carácter sexual, si ello no hubiera ocurrido.
En última instancia, la opinión mayoritaria sustituye el criterio de la jueza de instancia que vio y escuchó los testigos, adjudicó credibilidad y fijó responsabilidades luego de aquilatar la prueba desfilada, por el propio. Ésta concluyó que el señor Vélez estuvo involucrado en “un incidente de carácter sexual con una maquinista” y no había sido sancionado por ello.

 Aquí nuevamente diferimos del criterio mayoritario. El Tribunal sostiene que, aun asumiendo que Televicentro hubiese sancionado al señor Vélez luego del incidente con la maquinista, ello no hubiera evitado el incidente posterior. Indica el Tribunal: “Asumiendo, nuevamente a los fines de la argumentación, que Televicentro de Puerto Rico hubiera emitido una reprimenda respecto a Vélez o, incluso, lo hubiera suspendido: ¿dicha acción disciplinaria hubiera evitado la ocurrencia del incidente con la demandante Hernández Vélez? La contestación en la negativa es mandatoria; su conducta criminal era totalmente imprevisible”, (Enfasis en original.) Opinión mayoritaria, pág. 820.
Cabe destacar que en este caso no se dilucida controversia alguna de naturaleza “criminal”. Se trata de determinar la responsabilidad civil que pueda recaer sobre un patrono por sus propias acciones u omisiones, advertido como fue de que un empleado ha quebrantado las normas de conducta aceptables en el taller de empleo. Pero más importante, nos tenemos que preguntar si la consecuencia de lo que sostiene la mayoría es que las sanciones a los empleados en casos de hostigamiento sexual son innecesarias pues no hay certeza de que tendrían efecto disuasivo alguno. Parece evidente que no podemos compartir tal criterio.

 Sorprende por demás que, advertido Televicentro de las acciones de Vélez en este caso y con una recomendación de la Directora de Recursos Humanos de que éste fuera suspendido de empleo, habida cuenta de su historial, el patrono optara por meramente enviar una carta de reprimenda. Esta actitud relajada de parte del patrono poco abona a adelantar la política de cero tolerancia al hostigamiento sexual en el empleo que éste pregona.